**SONNENBLICK–GOLDMAN CORP., Plaintiff,**

v.

**MARBELLA DEL CARIBE, Defendant.**

**No. 72 Civ. 5152.**

United States District Court, S. D. New York.

Dec. 12, 1975.

---

Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiff; David I. Goldblatt, Steven S. Miller, New York City, of counsel.

Forsyth, Decker, Murray & Broderick, New York City, by Samuel J. Murray, New York City, for defendant.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

The plaintiff, Sonnenblick-Goldman Corp., and the defendant, Marbella Del Caribe, Inc., entered two contracts dated November 8, 1971, under the terms of which the plaintiff became the exclusive agent of defendant for the purpose of securing construction and long term mortgages for the defendant's condominium project in Puerto Rico.

The plaintiff has sued to recover commissions which it alleges are owing. The defendant has counterclaimed on several grounds as set forth below. The facts, which were developed at a trial before me, sitting without a jury, are set out below. This opinion will constitute findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P.

The November 8, 1971 contracts provided that plaintiff would be the exclusive mortgage broker for defendant for a period of 30 days plus 15 additional days if necessary and thereafter until the authorization was cancelled by defendant. The plaintiff was to procure a permanent mortgage commitment in the amount of $16,000,000 and first mortgage construction loans also in the amount of $16,000,000. The broker's commission was to be 1 per cent of the permanent commitment and 1.5 per cent of the construction loan.

The Pre-Trial Order, signed by the attorneys for both parties and "SO ORDERED" by me, states that the commissions were "to be deemed earned upon Marbella's receipt of a loan commitment upon terms acceptable to Marbella," (Pre-Trial Order Statement of Undisputed Facts, ¶ 7(d), ¶ 8(c)).[1]

In both contracts the defendant agreed to accept loans as described therein and to pay the full commission in the event of a failure to accept such loan or commitment. However, both contracts provided that acceptance of commitments secured thereunder would be contingent upon the plaintiff's securing both the permanent and the construction loan commitments.

A good faith deposit of $80,000 was provided for by the "construction loan" contract. That amount was to be credited against commissions due, if in fact the commitment were secured, but was to be refunded to defendant after 30 to 45 days if no loan commitment was delivered.

Both contracts further provided that they could be altered only by written agreement.

On November 9, 1971, the defendant deposited $80,000 with Sonnenblick as per the construction loan contract.

On or about March 28, 1972, Marbella accepted a commitment for permanent financing issued by the Bayamon Federal Savings and Loan Association of Puerto Rico ("Bayamon") and the West Side Federal Savings and Loan Association of New

---

1. According to the contracts the commissions were to be deemed earned upon the receipt by defendant of loan commitments either in compliance with the terms of the November 8, 1971 contracts or with other terms "accepted" by defendant.

York City ("West Side") in the amount of $9,016,400 for Tower I of the condominium project and $8,996,000 for Tower II.[2]

This offer required a commitment fee by the defendant of $450,310 of which $150,000 was to be paid by May 15, 1972, the balance to be paid on the closing of the construction loan. At the time that the commitment was accepted, the defendant agreed in writing to pay a non-refundable $25,000 of the commitment fee to Bayamon. To this end, the defendant gave plaintiff written authorization to disburse to Bayamon $25,000 out of the $80,000 "good faith deposit." The disbursement was made.

■ A letter dated March 28, 1972 and signed by Marbella reaffirmed Sonnenblick's exclusive authorization to procure financing for Marbella and provided that the permanent commitment would be held by Sonnenblick in escrow until the entire commitment fee was paid at which time the commitment would be released to defendant and would then be in full force and effect.[3] Another letter of the same date reaffirmed the fact that Sonnenblick had "secured a permanent mortgage commitment" and that Marbella had accepted it.

There was testimony that after March 28, 1972, Sidney Troy, the national mortgage director of plaintiff, made some unsuccessful efforts to procure construction financing for the defendant's project.

On April 25, 1972, Marbella sent plaintiff a telegram informing Sonnenblick that Marbella was cancelling the authorization to obtain financing for the condominium project and requesting the return of the $55,000 which represented the balance of the "good faith deposit."

The parties ceased their dealings while defendant apparently pursued negotiations with another lender. The $55,000 was not returned. On or about May 3 or 4, Dario Sarmiento, the president of Marbella, and Sidney Troy had a conversation in which Sarmiento indicated that his independent negotiations for a construction loan had not succeeded. According to Troy, Sarmiento requested the plaintiff to resume its efforts and to "do [its] utmost in securing    .  . the construction loan financing." On the other hand, Mr. Sarmiento's testimony was that Troy had invited the Sarmientos (Dario and his cousin Luis Carlos) to New York to

2. There was some evidence that the defendant had begun negotiations with these banks prior to entering into the November 8, 1971 contracts with plaintiff. However, no commitment was received until after the plaintiff had been engaged as an exclusive broker and there is documentary evidence signed by the defendant that the plaintiff was its exclusive agent on March 28, 1972.

3. The contention of defendant that the fourth and fifth paragraphs of this letter obligated them to use Sonnenblick as its exclusive broker or lose the permanent commitment is negated by the language of the letter:

"It is further agreed that in the event the principals do not use your commitment as the permanent mortgage commitment for this project, we assure you we will return the permanent mortgage commitment given to us by your institutions and held in escrow by us to you and notify these principals that we in no way wish to continue our authorization to secure any financing for them on this project.

"It is further agreed that if the principals do not use the commitment as described above

from Bayamon Federal Savings and Loan Association and West Side Savings and Loan Association, Sonnenblick-Goldman Corp. assures these participating lenders that they will not recommend the construction loan to the North American Mortgage Investors trust or Mortgage Growth Investors or any other lending institution to make this construction loan."

It is clear that this language merely obligated plaintiff to return the commitments held in escrow to the lenders in the event that defendant did not use the commitment. Further, in such a situation, plaintiff would cease its efforts to secure financing for the defendant.

Moreover, according to Dario Sarmiento's deposition testimony, in his conversation with Troy after defendant had cancelled the project authorization he told Troy that "we were completely free to ask for the interim financing in other institutions" (emphasis added). The clear implication of that testimony was that the Sarmientos believed their permanent commitment to be valid despite their cancellation of plaintiff's exclusive authorization.

meet bankers with whom Troy expected success.

The Sarmientos came to New York and with Mr. Troy apparently visited a bank, which visit they termed "fruitless." In any case, the Sarmientos contend and I find that they informed Troy that they considered the November 8, 1971 agreements terminated and that they would negotiate with any and all lenders on their own and would deal with Troy if he produced satisfactory financing for them.

Thereafter Troy negotiated an extension of the May 15, 1972 deadline for defendant's payment of the commitment fee to the permanent lenders. Bayamon and West Side agreed to extend the deadline to June 15, 1972 on condition that Marbella pay an additional $25,000 toward the total fee. Dario Sarmiento testified that he agreed to this provided that the $25,000 be refundable. The agreement of May 15, 1972 was silent on the question of refundability. Dario Sarmiento authorized Troy to pay the $25,000 out of the remaining $55,000 of the "good faith deposit" which had remained with the plaintiff. The payment was made on May 17, 1972.

Both parties apparently continued their efforts to procure a construction loan and the Sarmientos informed Troy of their efforts in their own behalf. In late May of 1972, an amendment to the Puerto Rican tax law changed the tax consequences of a loan between a real estate investment trust and a borrower in Puerto Rico. The principals met again and determined to make an application for a construction loan to the North American Mortgage Investors ("NAMI"), a real estate investment trust to which a division of plaintiff corporation served as investment advisor. Apparently, NAMI had been unsuccessfully approached before the change in the tax law.

On or about June 1, 1972, the defendant agreed in writing that the most recent $25,-000 payment to Bayamon and West Side was non-refundable. According to defend-

ant this agreement was procured by the representation of Troy that the construction loan "was absolutely ready."

An application dated June 2, 1972 was submitted by defendant to NAMI requesting a construction loan in the amount of $8,900,000 and a standby loan in the same amount. The application was for a construction loan for one tower of the two-tower project whereby NAMI would have the right, but not the obligation, to make the loan for the second tower. As per the application, the defendant deposited with plaintiff $89,000 as a security deposit to be held in an escrow account. The $89,000 consisted of a $30,000 check, representing the balance of the original "good faith deposit" which defendant authorized plaintiff to disburse and a $59,000, 30-day note.

According to the Pre-Trial Order Statement of Facts, the $89,000 was "returnable 'in the event that Lender does not accept this application within ten (10) days from the date hereof . . . .'"[4] In the event that the application was accepted but the loan was not closed within 60 days of the lender's acceptance, the lender had the option of rejecting the agreement and the security deposit was to be paid over to the lender.

There was conflicting evidence as to when the plaintiff's advisory committee had approved the application and recommended it to NAMI as well as to when NAMI approved the application.

On or about June 13, 1972, the plaintiff contacted Bayamon and West Side and obtained a further 30-day extension for the payment of the balance ($75,000) of the commitment fee on the permanent loan. The terms of such an extension required the immediate payment of $25,000. The defendant never signed this agreement nor did it make the payment.

NAMI formally "accepted and approved" the defendant's application on June 16, 1972, and plaintiff gave defendant formal

4. The application itself provided that plaintiff was "directed to" return the security deposit if

the lender failed to accept the application within ten days from the date of the application.

written notification of the approval that same day. Sometime thereafter, Troy went to Puerto Rico and met with the Sarmientos. There, on June 25, 1972, Dario Sarmiento signed a letter prepared by plaintiff (which was not signed by NAMI) relating to the sales and management organization for the sale of the condominium apartments. However, he did not sign a letter acknowledging and accepting the NAMI commitment, providing when plaintiff would be deemed to have earned its commission, and agreeing that plaintiff had the exclusive right to secure construction financing for the second tower; nor did he sign a note for $89,960 to plaintiff; nor did he sign a letter to Bayamon and West Side providing for the further extension of the payment of the commitment fee as described above.

There was conflicting testimony as to whether or not Dario Sarmiento agreed to review the first two documents listed above and sign them. In any case, they were never signed nor was the additional $25,000 ever paid to Bayamon and West Side. There was further conflicting testimony as to defendant's cooperation and efforts to close the NAMI loan. Marbella's attorney, Rafael Benet, apparently worked toward achieving subordination of the existing mortgages on the property as required by the NAMI commitment. NAMI's Puerto Rican counsel also apparently worked toward a closing. The evidence is conflicting as to whether or not Dario Sarmiento cooperated and met with NAMI's attorneys in Puerto Rico; however, I find the conflicts to represent less a credibility question than a failure by all the witnesses to recall accurately the actual events as to which even the documentary evidence is ambiguous.

Neither NAMI nor Marbella ever accomplished certain pre-closing preparations, among which were subordination of existing mortgages on Marbella's part as required by the construction loan commitment and the participation of a Puerto Rican bank on NAMI's part, as permitted by the commitment. Defendant contends that Troy had misrepresented on June 19, 1972 that the participation of a Puerto Rican bank had been secured. Plaintiff contends that defendant thwarted the participation by the Banco de Ponce when Luis Carlos Sarmiento had the matter removed from the agenda of that bank's Board of Directors meeting after learning that defendant had obtained both the permanent and construction financing from Housing Investment Corporation ("H.I.C."). Defendant disputes this. Additionally, defendant complains that it learned on June 26, 1972 that it would be expected to pay an additional ½ per cent to the participating Puerto Rican bank.

According to plaintiff, on July 14, 1972 Dario Sarmiento notified NAMI's Puerto Rican attorneys that Marbella had obtained the financing through H.I.C. and was terminating dealings with Sonnenblick and NAMI. The attorneys so informed Troy both by telephone and letter. Dario Sarmiento also had an attorney write to plaintiff on July 14, 1972 terminating dealings with Sonnenblick and NAMI and demanding the return of the security deposit made pursuant to the NAMI application.

Plaintiff's Puerto Rican attorneys informed H.I.C. of an apparent conflict between the Sonnenblick-procured financing commitment and the H.I.C. commitment. Nevertheless, H.I.C. proceeded to execute an agreement with Marbella on July 28, 1972 for both the long term and construction financings for both towers. Neither the $30,000 check nor the $59,000 note given to plaintiff to be held in escrow for NAMI were returned. The note was not honored by defendant when presented for payment.

In December 1972, Sonnenblick started this suit for breach of the November 1971 agreements or, in the alternative, in quantum meruit for the reasonable value of its services. Plaintiffs seeks $313,624 in commissions plus interest from June 16, 1972. Marbella counterclaimed for breach of contract, tortious interference with contractual relations, and for damage to Marbella's reputation in the financial community.

Marbella's counterclaims for $102,000 in penalty payments to their construction company as well as $184,235.60 in interest payments to mortgagees and lien holders must fail since plaintiff was under no contractual obligation to deliver commitments by a date certain nor to indemnify defendant for such expenses. Although delays are clearly a cause for concern in a project such as this, defendant reserved the right to cancel the November 1971 agreement if plaintiff did not secure the commitments promptly. Similarly, defendant's counterclaim for the $50,000 paid to Bayamon and West Side cannot succeed since defendant specifically authorized the payments and agreed in writing to their being non-refundable.[5] The claim for incidental damages due to Dario Sarmiento's vacation delay (yacht rental) and travel expenses must fail for insufficient proof both as to liability and amount. In fact, there was testimony that Dario Sarmiento, not the defendant corporation, paid many of these expenses individually.

As to the claim of damage to contractual relations due to Sonnenblick's attorneys' letter to H.I.C., there has been no showing of either impropriety (see *Felsen v. Sol Cafe Manufacturers Corp.,* 24 N.Y.2d 682, 301 N.Y.S.2d 610, 249 N.E.2d 459 (1969)) or of damage since H.I.C. was in no way deterred by the letter. See *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956). Likewise as to the dishonor of the $59,000 note the proof of damages arising from presentation of the note for payment was inadequate. In fact, the defendant has apparently abandoned its counterclaims for damages for incidental expenses, damage to contractual relations, and damage to Marbella's reputation and these claims are not argued in its post-trial brief.

However, the claim that the $89,000 NAMI deposit should be returned has more substance and will be treated more thoroughly below.

I find that the permanent mortgage commitment was secured through the efforts of the plaintiff during the period of its exclusive authorization under the November 8, 1971 agreement. The defendant acknowledged this in writing and accepted the commitment in writing. The parties agreed that the plaintiff's commission would be earned upon defendant's receipt of an acceptable commitment. Defendant's acceptance of the commitment is irrebuttable evidence of the acceptability of the Bayamon-West Side commitment. The term in the brokerage agreement making acceptance conditional on Sonnenblick's securing the construction loan was waived when defendant actually accepted the commitment. In any case, acceptance was not a prerequisite to the commission's being earned. Moreover, there was deposition testimony by Dario Sarmiento that after the April 25 cancellation he was "completely free to ask for the interim financing" elsewhere. Apparently he expected to use the Bayamon-West Side commitment for the permanent loan even if he secured his own interim financing. The fact that defendant later received both the permanent and construction financing from H.I.C. does not destroy plaintiff's right to its commission on the permanent loan.

However, the April 25, 1972 telegram did effectively cancel the plaintiff's authorization. I find that when the parties resumed dealings in early May 1972, it was their intention to function under terms similar to those in the November agreement minus the exclusivity term.

In *Alexander v. Brumfield,* 124 Miss. 177, 87 So. 9 (1921), referred to by plaintiffs, the court held that a request to a broker (after purported cancellation of his authorization) to continue his efforts to sell "without more, must be held to mean in accordance with the terms of the original agreement . . . ." However, in this case there was more. There were repeated representations to plaintiff by the princi-

---

5. In fact, when Marbella terminated its dealings with plaintiff in July 1972, it requested the return of the $89,000 NAMI deposit, but not the $50,000 paid to Bayamon and West Side.

pals of the defendant that they were making their own efforts to secure financing, but that they would entertain commitments that plaintiff procured. The conduct of the parties indicates that a contract existed starting in early May 1972. See *Wineburgh v. Seeman Brothers, Inc.,* 21 N.Y.S.2d 180, 186 (Sup.Ct. N.Y.Co. 1940); *Renner v. John T. Stanley Co., Inc.,* 136 Misc. 492, 240 N.Y.S. 148 (Sup.Ct. Kings Co. 1930). However, their conduct clearly negates any inference of exclusivity into the terms of such a contract.[6]

The plaintiff argues that its commission was earned upon delivery to the defendant of any "acceptable" commitment. Plaintiff's theory is that the commitment must have been acceptable since it was an endorsement of defendant's own application. However, it is not at all clear to me that the terms of the agreement between the parties after they resumed their dealings in May 1972, provided for the commission's being due merely upon delivery of an acceptable commitment.

In fact, the letter of June 16, 1972 from Troy to Dario Sarmiento, informing Sarmiento of the NAMI commitment and seeking (among other things) acceptance of the commitment and acknowledgment of plaintiff's future exclusive authorization to secure financing, provided that part of the brokerage fee on the construction loan would be "deemed earned and payable" and part would be "due and payable" at the closing of the First Mortgage Construction Loan on Tower I.[7]

I find this letter, written at the time of the events in issue, to be far more probative as to the understanding by the plaintiff of the terms of its agreement with defendant than any other evidence produced.

Moreover, the fact that Troy made the trip to Puerto Rico to meet with the Sarmientos after the commitment had been issued and continued to work toward a closing of the loan is further proof that plaintiff believed a closing of the loan to be necessary in order for plaintiff to earn its fee. Had this not been the case, the plaintiff would have had no reason to work toward a closing of the NAMI loan since its fee would already have been earned.[8]

Furthermore, defendant argues that no commission was earned on the June 16, 1972 NAMI commitment since it was made more than 10 days after the June 2, 1972 date of the application and was therefore unacceptable. The 10 day provision is located in ¶ 4(A) of defendant's application to NAMI. That paragraph relates specifically to the $89,000 security deposit and requires the return of the deposit in the event that the application was not accepted within ten days. There was considerable testimony and I find it extremely credible that the principals of defendant believed and intended this provision to require acceptance by NAMI within ten days and so conveyed their intent to plaintiff. Whether or not that is what the language says on its face and whether or not NAMI might have understood this provision differently is irrele-

---

6. The fact that after the April 25, 1972 cancellation defendant authorized plaintiff to make payments to Bayamon and West Side out of the "good faith deposit" provided for in the November 1971 agreement did not in the face of all the other evidence revive the exclusive brokerage agreement.

7. The defendant never signed the June 16, 1972 letter, from Troy.

8. While it is true as plaintiff argues that delay of or failure to close a loan occasioned by the principal cannot defeat a broker's right to commission, see, e. g., *Lane-The Real Estate Department Store, Inc. v. Lawlet Corp.,* 28 N.Y.2d

36, 43, 319 N.Y.S.2d 836, 268 N.E.2d 635 (1971), in this case the delays were not solely due to defendant. In fact, plaintiff describes at length the defendant's efforts toward closing the loan to prove a different part of plaintiff's case. Plaintiff cannot have it both ways. Even if Luis Carlos Sarmiento did request that the question of participation in the loan be withdrawn from the agenda of the Banco de Ponce, a fact of which I am not convinced, there remained a number of impediments to closing the NAMI loan such as the additional ½ per cent for the Banco de Ponce and the subordination of existing mortgages on the property.

vant since NAMI is not a party to this action.

■ However, the fact that the plaintiff drafted most of the application for the defendant knowing defendant's desire to receive an answer within ten days bears on the acceptability to defendant of the commitment's terms. There was credible testimony that defendant ceased other negotiations for a period of approximately ten days while waiting for a response from NAMI. When the commitment was finally received fourteen days later, defendant did not formally accept it, although it did take steps consistent with working toward a closing.

Taking together the defendant's failure to accept the commitment, its insistence to plaintiff that it wanted a response within ten days of the application, plaintiff's confusing indications as to when the application had been approved, Troy's visit to Puerto Rico in late June, and the discussion at that time of an additional ½ per cent to be paid to a participating Puerto Rican bank, I am convinced that the NAMI commitment was not automatically "acceptable" to defendant on June 16, 1972. Certainly, there was evidence that defendant would have preferred a commitment covering both towers (as it eventually received from H.I.C.) as well as one without the so-called "escape hatch" should the tax consequences in Puerto Rico prove unfavorable to the lender.

Thus I find that the plaintiff could not earn its fee merely by delivering an "acceptable" commitment to the defendant and that in any case the plaintiff did not prove, under all the circumstances, that the NAMI commitment was acceptable to the defendant on June 16, 1972.[9]

■ Finally, as to the $89,000 security deposit, I find that the plaintiff as escrow agent for the $30,000 check and the $59,000 note is liable for the return of the deposit. The plaintiff was directed to return the deposit if the lender failed to accept the application within ten days. In fact, it is plaintiff's contention elsewhere that the ten day provision only required the return of the deposit and did not limit the acceptability of the application. It is irrelevant that defendant did not request the return of the money until July 14, 1972. It is perfectly plausible that defendant was willing to leave the money and note in escrow to be used in the event that it worked out a satisfactory arrangement with NAMI. However, at no point did defendant waive its right to the return of the deposit as required by the terms of the June 2, 1972 application.

In summary, I find that the plaintiff is entitled to its commission on the permanent commitment; that the plaintiff has failed to prove its right to a fee on the NAMI commitment; that defendant has failed to prove all of its counterclaims except the one for return of the $30,000 and the $59,000 note which comprised the security deposit.

Settle Order on Notice.

---

9. The claim for quantum meruit recovery is argued as an alternative should no contractual relationship be found to exist after the April 1972 cancellation. I have found that a contractual relationship did exist and therefore it is unnecessary to consider this alternative. Cf. *Miller v. Schloss*, 218 N.Y. 400, 406, 113 N.E. 337 (1916).